## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**DAMON ZAESKE**                                                    **PLAINTIFF**

**V.**                              **CASE NO. 5:15-CV-5305**

**LIBERTY LIFE ASSURANCE COMPANY**
**OF BOSTON**                                                       **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

This case comes before the Court following Defendant Liberty Life Assurance Company of Boston's ("Liberty Life") decision to terminate Plaintiff Damon Zaeske's long-term disability benefits. The dispute arises under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, which gives participants in an employee welfare benefit plan a cause of action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

Before the Court are the Administrative Record (Doc. 12), Plaintiff's Brief (Doc. 13), and Defendant's Brief and Affidavit (Docs. 18, 18-1). The Court also received a letter from Mr. Zaeske, (Doc. 19), on April 19, 2017, after the Administrative Record had been submitted and the parties' had submitted their briefs. Because the letter came directly from Mr. Zaeske, rather than his attorney, and was not part of the Administrative Record on appeal, the Court gave it no consideration. For the reasons explained herein, the Court finds that Liberty Life's decision to deny long-term benefits to Mr. Zaeske is **REVERSED** and the claim **REMANDED** to Liberty Life for the correct calculation of past-due benefits.

## I. BACKGROUND

At the time counsel briefed this ERISA appeal, Mr. Zaeske was a 52-year-old man formerly employed by Wal-Mart Stores, Inc. ("Walmart") in the position of Project Manager I, Systems Strategy—Risks Manager ("Risk Manager"). His duties included observing associate, customer, and supplier behavior first-hand; making group presentations; using a computer to locate information; creating documents using a computer or writing instrument; visually verifying information, often in small print; safely operating a motor vehicle; and traveling both domestically and internationally to multiple facilities, requiring consecutive or extended overnight stays. (Doc. 12-3, p. 397). As an employee of Walmart, Mr. Zaeske was a member of its Associate Health and Welfare Plan (the "Plan"), which is insured by a Group Disability Income Insurance Policy issued by Liberty Life (the "Policy"). In addition to issuing the Policy and paying benefits, Liberty Life also serves as Policy Administrator.

Mr. Zaeske's medical condition that gives rise to his claim for benefits was first documented in 2010. In August of that year, Mr. Zaeske visited Dr. David Garrett, a physician practicing at Mercy Clinic in Lowell, Arkansas ("Mercy Clinic"), and complained of depression and chronic pain, including back pain. (Doc. 12-3, p. 79). Dr. Garrett prescribed Darvocet, a pain medication used to treat mild to moderate pain, for his "occasional use." *Id.* On August 25, 2010, Mr. Zaeske had a follow-up appointment with Dr. Garrett, and during that examination, Dr. Garrett noted tenderness in the L5-S1 area of his lumbar spine. *Id.* at 80. Also during that visit, Mr. Zaeske complained that "he [could not] sit for very long" when his back pain struck, and he "ha[d] to constantly move." *Id.* Dr.

Garrett prescribed him a steroid injection for his back and refilled his pain medication prescription. *Id.*

Sometime later, on October 7, 2011, Mr. Zaeske returned to Dr. Garrett, complaining again of back pain and tenderness, anxiety, depression, restless leg syndrome, and fatigue. *Id.* at 82. Dr. Garrett prescribed oxycodone for pain and Celexa for depression. *Id.* at 83. Mr. Zaeske's back exam "demonstrated tenderness on the right paravertebral muscle group." *Id.* He returned to Dr. Garrett on May 4, 2012, complaining of chronic pain, and refilling his medications. *Id.* at 84. It appears that his back pain worsened in the ensuing months, as during the next check-up on January 2, 2013, Mr. Zaeske reported to Dr. Garrett that the oxycodone was not working well, and that the Darvocet he had been taking for pain was now off the market. *Id.* at 85. Dr. Garrett stopped his prescription for oxycodone, but prescribed Voltaren, a non-steroidal anti-inflammatory drug, and Flexeril, a muscle relaxant. *Id.* at 86.

On October 29, 2013, Mr. Zaeske had an appointment with Dr. Janelle Potts, another physician at Mercy Clinic. During that visit, Mr. Zaeske complained primarily of lower back pain. He explained to Dr. Potts that he had experienced "low back pain for many years off and on," but only recently had "a flair up [sic]" that caused his "[r]ight leg . . . [to] go numb and tingly at times when laying in bed." *Id.* at 87. Dr. Potts conducted a physical examination that revealed lumbar tenderness, so she scheduled a lumbar MRI and planned to perform two injections, one of methylprednisolone acetate and one of dexamethasone—both corticosteroids used to treat inflammation. *Id.* The MRI, performed on November 6, 2013, revealed "chronic appearing disc protrusion with severe stenosis

at L4-5." *Id.* at 282.  Dr. Potts subsequently submitted a Certificate of Health Care Provider for Associate's Serious Heath Condition Form (an "FMLA form") on November 15, 2013, in which she stated that Mr. Zaeske would be incapacitated for three days per month due to back pain and the effects of pain medication, and that these restrictions would apply for six months.  She also noted that he had been "sent for [an] MRI and referred to [a] back surgeon." *Id.* at 41-42.  She further explained that "when incapacitated with back pain [he] cannot perform any task," *id.* at 41, and emphasized that the medication he was currently taking for back pain "can cause somnolence, decreased concentration, [and] inability to drive + make decisions," *id.* at 42.

After a follow-up appointment on December 2, 2013, Dr. Potts wrote in her progress notes that "hydrocodone [was] not really controlling [Mr. Zaeske's] pain," and that he was "[f]inding it difficult to work due to pain." *Id.* at 88. During that same visit, she prescribed him Dilaudid, an opioid pain medication, to be used in conjunction with hydrocodone in order to control any breakthrough pain, and she instructed that he should not work for two weeks. *Id.* at 89. Then, on December 9, 2013, she completed another FMLA form, advising that Mr. Zaeske would be unable to work from December 2, 2013, through December 25, 2013, because he was "taking strong narcotics for pain" and was "unable to work while under the influence" of these medications. *Id.* at 43.

Dr. Potts' progress notes from February 10, 2014 reveal that on January 14, 2014, Mr. Zaeske underwent a lumbar medial bilateral branch nerve block at the Springfield Pain Management Center, which provided "good results." *Id.* at 302, 305.  However, Mr. Zaeske's pain recurred shortly thereafter, due to effects of "spinal stenosis and bulging

4

discs," and he was instructed to take Tizanidine—a muscle relaxant—and hydrocodone for pain. *Id.* at 302-03. Mr. Zaeske then visited Dr. Jonathan Nunley at Mercy Clinic on February 17, 2014. Dr. Nunley noted that Mr. Zaeske's back pain worsened with extension, standing, and walking. *Id.* at 57. Dr. Nunley then made plans to perform a second lumbar medial branch nerve block on Mr. Zaeske's lumbar spine. *Id.* at 60. On February 26, 2014, Dr. Nunley successfully performed that procedure and then scheduled a follow-up appointment. *Id.* at 60-61. Because the second medial branch nerve block also achieved good results, Dr. Nunley performed two radiofrequency neurotomies on Mr. Zaeske, one on March 13, 2014, and the other on April 2, 2014. *Id.* at 62-65. But, on April 2, 2014, Dr. Nunley concluded that the radiofrequency neurotomies had not resulted in "much relief of back pain to this point," and that Mr. Zaeske suffered "[c]ontinued pain worse with extension and with standing for long periods." *Id.* at 65.

Mr. Zaeske had an appointment with Dr. Potts on April 7, 2014. She noted that, although he was "[t]aking medications as directed," his "[b]ack pain [was] not well controlled," and he "had to miss work due to back pain and the effects of pain medications." *Id.* at 94. This was true despite the fact that he "had injections with Mercy pain management." *Id.* She also observed that his job was "in jeopardy." *Id.* The record reflects that the very next day, April 8, 2014, Mr. Zaeske made a claim for long-term disability benefits under the Policy, and indicated that April 7, 2014, was the date his disability began. In support of his claim, Dr. Potts completed two FMLA forms, one on April 18, 2014, *id.* at 47-48, and the other on May 29, 2014, *id.* at 45-46. The April 18 form stated Dr. Potts' medical opinion that the "strong narcotics" Mr. Zaeske was taking for back

pain, leg pain, and weakness made him "unable to work under the influence" from April 7, 2014, until May 9, 2014.  *Id.* at 47-48.  In the May 29 form, she wrote that Mr. Zaeske was "unable to perform any function when incapacitated due to pain" caused by "intervertebral disc protrusion, lumbar degenerative disc disease . . . [and] radiculopathy of [the] leg."  *Id.* at 45-46.  She estimated he would be unable to work at his regular job from May 20, 2014, through November 20, 2014.  *Id.* at  46.

Also on April 8, 2014, Mr. Zaeske called Liberty Life and had a conversation with his case manager, June Arrington, as reflected in the claim notes of the Administrative Record.  Ms. Arrington documented in the file that Mr. Zaeske talked with her about his claim and informed her that he was not a candidate for back surgery and had recently undergone ablation therapy. He also told her that Walmart had recently warned him that "he must find another job within Walmart[,] as he cannot do his job."  *Id.* at 13.

On May 23, 2014, Ms. Arrington referred Mr. Zaeske's disability claim to Dr. Patricia Shannon for an independent medical assessment. The referral sheet pertaining to the assessment noted that Mr. Zaeske's job as Risk Manager for Walmart involved "[l]ight" physical demands, and therefore was not a sedentary position.  *Id.* at 282.  Dr. Shannon reviewed the medical documents submitted by Drs. Garrett, Potts, and Nunley, including the lumbar MRI from November 6, 2013, and concurred with the treating doctors' collective diagnosis of "[c]hronic low back pain with recently increased back and leg pain."  *Id.*  She found that Mr. Zaeske's MRI "showed chronic appearing disc protrusion with severe stenosis at L4-5    . . . ."  *Id.* In addition, she identified several "co-morbid conditions potentially impacting [his] capacity," namely, "[m]orbid obesity, anxiety, [and] sleep

disorder." *Id.* In determining whether Mr. Zaeske met the definition of "disability" under the Policy, Dr. Shannon found that his current estimated work capacity was "sedentary," rather than the "light" level of activity needed to perform his current job. *Id.* She declined to assess whether any potential accommodations existed that would facilitate a return to work, but observed that Mr. Zaeske was currently limited in his ability to sit, stand, walk, bend, stoop, squat, climb ladders, or lift objects weighing more than ten pounds. *Id.* at 283. She concluded her report by opining that the limitations on his mobility would likely last "an additional 3 months"—for a total of six months—but that his overall prognosis was "depedent [sic] on response to treatment." *Id.*

Meanwhile, as the claim-review process progressed, Mr. Zaeske continued to receive further treatment for his back pain from his primary physicians. Dr. Potts submitted another FMLA form to Liberty Life on May 30, 2014. *Id.* at 50. That same day, Dr. Nunley performed another steroid injection on Mr. Zaeske's lumbar spine. *Id.* at 71. It was not until June 4, 2014, that Liberty Life sent Mr. Zaeske a letter notifying him that his long-term disability claim had been approved. *See id.* at 264. In the letter, Liberty Life concluded that Mr. Zaeske met the Plan's definition of "disabled," with respect to his ability to perform "the Material and Subtantial Duties of his Own Occupation." *Id.* at 264. His date of disability onset was found to be April 7, 2014, and he was deemed eligible to receive benefits as of July 6, 2014. The letter from Liberty Life also informed Mr. Zaeske that it would evaluate his claim "periodically to determine ongoing disability." *Id.*

Throughout the month of June 2014, Mr. Zaeske continued to see Drs. Potts and Nunley. In an appointment with Mr. Zaeske on June 10, 2014, Dr. Potts noted that his

back pain had worsened and was "uncontrolled," that he was unable to work while taking pain medications, and that he should continue taking oxycodone and Dilaudid for pain, and Robaxin, a muscle relaxant. *Id.* at 97-99. After a visit with Mr. Zaeske on June 17, 2014, Dr. Nunley noted that both previous lumbar steroid injections had been unsuccessful in reducing Mr. Zaeske's pain levels, and that he continued to have "[c]onstant" low back pain that worsened with standing or walking, such that he was now sleeping in a recliner at night. *Id.* at 73. Dr. Nunley gave him yet another steroid injection on September 12, 2014, and noted Mr. Zaeske's continued low back pain in his notes. *Id.* at 76. On October 8, 2014, a different physician at Mercy Clinic, Dr. Gannon Randolph, examined Mr. Zaeske and noted he "[c]ontinues to have low back pain. All axial, midline and band of pain." *Id.* at 159.

At this point, Mr. Zaeske had been receiving long-term disability benefit checks for only a few months. On October 12, 2014, Ms. Arrington of Liberty Life wrote a letter to Mr. Zaeske, requesting that he obtain updated medical information on his condition from his treating physicians, Drs. Potts, Nunley, and Randolph. *See id.* at 253. When Liberty Life received no immediate response from the doctors, it sent another request on October 27, 2014. *See id.* at 211, 219, 227. Two days later, Dr. Randolph sent a summary of his notes from his visit with Mr. Zaeske on October 8, 2014. The notes listed Mr. Zaeske's current medications for pain and inflammation, which included Gabapentin, Robaxin, oxycodone, and Dilaudid, and observed that the reason why he was seen that day was for "[p]ain." *Id.* at 208. The notes also included an order that Mr. Zaeske submit to another lumbar MRI. *Id.* On November 7, 2014, Dr. Potts faxed a "Restrictions Form" to Liberty Life, in which

she identified Mr. Zaeske's continuing diagnosis as "lumbar degenerative disc disease," and noted that his "back pain, intervertebral disc protrusion . . . [and] abnormal MRI of lumbar spine." *Id.* at 203. She confirmed that he was still receiving spinal injections, and she opined that his return-to-work date was "yet to be determined." *Id.*

Liberty Life apparently viewed these submissions by Drs. Randolph and Potts as insufficient to document Mr. Zaeske's continuing disability. On November 14, 2014, Ms. Arrington wrote a letter to Mr. Zaeske, informing him that his benefits were suspended, and that unless further medical records were provided by December 11, 2014, his claim would be terminated. *See* Doc. 196. One day after the deadline, on December 12, 2014, Ms. Arrington wrote another letter to Mr. Zaeske, letting him know that since Liberty Life "did not receive all the necessary information to investigate your claim, your claim has been denied effective December 11, 2014." *Id.* at 185.

A few days later, on December 15, 2014, Liberty Life received additional medical documentation from Drs. Potts, Nunley, and Randolph. *See id.* at 136-37. The documents included reports of medial branch nerve block procedures performed in February of 2014; a radiofrequency neurotomy performed in March of 2014; notes regarding physical exams, epidural steroid injections, and radiofrequency ablation procedures in April of 2014; reports of further steroid injections in September of 2014; and appointment notes and pain prescriptions written in October of 2014. *Id.* at 136.

Liberty Life referred Mr. Zaeske's claim to Dr. Stuart Glassman for an independent peer review. After he unsuccessfully attempted to reach Drs. Potts, Nunley, and Randolph over the phone on multiple occasions, Dr. Glassman reviewed the medical records on his

own and prepared a report, dated December 23, 2014. *See id.* at 141-145. He determined

that the "only diagnosis that could be causing [Mr. Zaeske's] impairment" was "lumbar

degenerative disc disease and back pain." *Id.* at 143. He believed the file contained "no

evidence of any disc herniation." *Id.* In light of that crucial finding, he deemed Mr. Zaeske

capable of returning to his job and performing "full time activities through a work day." *Id.*

His recommendation as to Mr. Zaeske's limitations and restrictions was as follows:

> It is felt that reasonably supported restrictions and limitations for a gentleman who is 51 years old with a history of lumbar degenerative disc disease, *but no evidence of any disc herniation* would be lifting 50 pounds occasionally, 25 pounds frequently, 8 hours a day, 5 days a week, with occasional bending, kneeling, squatting and climbing, frequent standing and walking, no restrictions for sitting, frequent reaching and driving and no restrictions for fine motor activity.

*Id.* (emphasis added).

Relying on Dr. Glassman's opinion, Ms. Arrington wrote a follow-up letter to Mr.

Zaeske on December 29, 2014, informing him that his claim had now been substantively

reviewed, and Liberty Life had concluded that he would not receive further benefits

because he was now able to "perform the duties of [his] own occupation" under the Policy's

definition. *See id.* at 136-38. Just two weeks after this letter was sent, Mr. Zaeske

underwent an MRI of his lumbar spine that confirmed the presence of a moderately sized

herniated disc in his lumbar spine. *See id.* at 23, 52-53.

On February 20, 2015, Mr. Zaeske appealed Liberty Life's termination of his

benefits. Along with his appeal form, he supplied a letter from Dr. Potts, dated February

10, 2015, *id.* at 111, a "Restrictions Form" completed by Dr. Potts the previous year, on

April 11, 2014, *id.* at 113, and an "Activities Questionnaire" that Mr. Zaeske had filled out

on April 20, 2014, *id.* at 114-16.  The February 2015 letter from Dr. Potts advised that Mr. Zaeske was currently unable to work "due to severe back pain and medication that causes drowsiness and inability to concentrate."  *Id.* at 111.  She explained that, in her opinion, "[h]e is unable to sit in chairs, walk[,] or stand for any length of time necessary to work."  *Id.*  The information she filled out on the "Restrictions Form" noted that, physically, Mr. Zaeske would be able to do only sedentary work with his condition, but that he was "[u]nable to do work *of any kind* presently because necessary pain medications cause somnolence + confusion."  *Id.* at 113 (emphasis added).

On March 10, 2015, Liberty Life completed its initial level of appellate review and upheld its decision to deny benefits.  The denial letter sent to Mr. Zaeske noted Liberty Life's reliance on Dr. Glassman's earlier review of the file from December 2014, and his conclusion that there was no disc herniation, no side effects from prescribed medications, and no restrictions needed for returning to work.  (Doc. 12-2, p. 5).  Although Liberty Life documented several submissions that Mr. Zaeske's doctors had added to the record for purposes of the appeal, Liberty Life found that there was "a lack of information to alter the previous medical assessment or to support a level of impairment that would preclude occupational functionality beyond December 11, 2014."  *Id.* at 7.

Post-appeal, Mr. Zaeske submitted further medical documentation to Liberty Life, including the lumbar spine MRI from January 13, 2015; a letter dated March 10, 2015, noting Mr. Zaeske's issues with bathing, personal hygiene, and problems associated with his weight; numerous FMLA forms from his treating physicians; and a certificate for issuance of a special license plate for disabled persons, dated March 30, 2015, in which

Dr. Potts had checked the box confirming that Mr. Zaeske could not "walk without the use of or assistance from a brace, cane, crutch, another person, . . . wheelchair or other assistive device." (Doc. 12-3, p. 33).

In view of this newly submitted medical information, Liberty Life conducted a second administrative review of the file by submitting it to another reviewing physician, Dr. Mark Reecer. In contrast to Dr. Glassman, Dr. Reecer *did* find that Mr. Zaeske suffered from a lumbar herniated disc, along with lumbar degenerative disease, chronic pain, and long-term narcotics usage. (Doc. 12-3, p. 26). Dr. Reecer wrote a report for Liberty Life that, among other things, specifically noted that he had reviewed Dr. Potts' February 10, 2015 letter, in which she opined that Mr. Zaeske's multiple pain medications negatively affected his ability to concentrate and made him sleepy. Nevertheless, Dr. Reecer's report made no mention of the effects that Mr. Zaeske's medications might have on his ability to perform his former job as Risk Manager for Walmart. Dr. Reecer found, instead, that there appeared to be "[n]o side effects from the current medication regimen," and "[t]herefore there are no restrictions based on the current medication regimen." *Id.* at 27. Without referencing any of Mr. Zaeske's specific job requirements, Dr. Reecer opined that Mr. Zaeske was capable of sitting for one-hour intervals, walking for one-hour intervals, standing for 30-minute intervals, and engaging in occasional climbing, crawling, squatting, kneeling, stooping, and crouching. *Id.* at 26. Overall, it was Dr. Reecer's view that Mr. Zaeske could, with these restrictions in place, "work 8 hour shifts, 40 hours per week," but "may have poor tolerance"—not due to the documented stenosis and herniated disc issues, which he conceded were present—but due to "morbid obesity and being grossly deconditioned." *Id.* at 27.

On June 1, 2015, in reliance on Dr. Reecer's findings, Liberty Life again upheld its decision to deny long-term disability benefits to Mr. Zaeske, finding as follows:

> We . . . are unable to alter the original determination to deny benefits beyond December 11, 2014 due to the additional medical evidence did not support your inability to perform the material and substantial duties of your own occupation, as defined by the Wal-Mart Stores, Inc. Associates' LTD Policy.

(Doc. 12-2, p. 1). Following the June 1 denial letter, Mr. Zaeske's administrative appeal rights were exhausted, and he filed the instant case in this Court on December 23, 2015. He now seeks review of the adverse decision to terminate his benefits, and he asks that he be awarded benefits as of December 12, 2014, the date they were first terminated, and for the remaining 12-month period provided under the Policy.

## II. LEGAL STANDARD

Generally, once a plaintiff has exhausted his administrative remedies, the Court's function is to conduct a review of the record that was before the administrator of the plan when the claim was denied. *Farfalla v. Mutual of Omaha Ins. Co.*, 324 F.3d 971, 974-75 (8th Cir. 2003); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). A denial-of-benefits claim under ERISA is reviewed for abuse of discretion when "a plan gives the administrator discretionary power to construe uncertain terms or to make eligibility determinations." *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 1997) (en banc) (citing *Firestone*, 489 U.S. at 111). When a plan confers discretionary authority, the Court must defer to the determination made by the administrator or fiduciary unless such determination is arbitrary and capricious. *Id.* at 115; *see Jackson v. Prudential Ins. Co. of Am.*, 530 F.3d 696, 701 (8th Cir. 2008) ("[R]eview for an 'abuse of discretion'

or for being 'arbitrary and capricious' is a distinction without a difference . . . ." (citing *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 946 n.4 (8th Cir. 2000)).

The Court finds that in the case at bar, abuse of discretion is the proper standard of review because the Policy confers upon Liberty Life, as Plan Administrator, the binding "authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility [there]under." (Doc. 12-1, p. 42). In general, the decision of a plan administrator may only be overturned if it is not "reasonable, i.e., supported by substantial evidence." *Donaho v. FMC Corp.*, 74 F.3d 894, 899 (8th Cir. 1996). A plan administrator's decision will be deemed reasonable if "a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." *Id.* If a decision is supported by a reasonable explanation, then it should not be disturbed, even though a different reasonable interpretation could have been made. *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997) (citing *Donaho*, 74 F.3d at 899). Nonetheless, although it is "not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence," that denial must still be supported by substantial evidence in order to withstand judicial scrutiny. *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924-25 (8th Cir. 2004). Substantial evidence means "more than a scintilla but less than a preponderance." *Schatz*, 220 F.3d at 949.

To determine whether Liberty Life's decision was reasonable, the Court will consider multiple factors. One factor is the conflict of interest that may exist when the same party is both claims administrator and insurer; that is, when the same party that makes the benefits decisions also pays the claims. *Firestone*, 489 U.S. at 115; *Atkins v. Prudential*

*Ins. Co.*, 404 F. App'x 82, 86 (8th Cir. 2010). The importance of this factor varies depending on whether the circumstances suggest a high or low likelihood that the conflict of interest affected the benefits decision. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). For instance, a conflict will weigh more heavily in circumstances "where an insurance company administrator has a history of biased claims administration" or where evidence shows "procedural unreasonabilities." *Metropolitan*, 554 U.S. at 117-18. On the other hand, it may be "less important . . . where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . . " *Metropolitan*, 554 U.S. at 117.

In addition to any potential conflict of interest, the Court will consider five other factors in determining whether Liberty Life's decision was reasonable:

> (1) whether the administrator's interpretation is consistent with the goals of the Plan; (2) whether the interpretation renders any language in the Plan meaningless or internally inconsistent; (3) whether the administrator's interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the administrator has interpreted the relevant terms consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

*Torres v. Unum Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005) (citing *Shelton v. ContiGroup Cos., Inc.*, 285 F.3d 640, 643 (8th Cir. 2002)) (the "*Shelton* factors").

### III. DISCUSSION

As an initial matter, Mr. Zaeske asserts that the Court should confer significant weight to the conflict of interest created by Liberty Life's status as both insurer and administrator under the Policy. However, the record does not indicate that Liberty Life has a history of biased claims administration, nor does it reveal any significant procedural irregularities. Further, the affidavit of the manager of Liberty Life's Appeal Review Unit

alleges that Liberty Life has taken "active steps to reduce potential bias" by geographically separating case managers from "those employees who make underwriting and premium decisions," and implementing departmental and managerial separation between case managers and underwriters. (Doc. 18-1, p. 3). Notably, three different reviewing doctors made decisions impacting the denial of benefits in this case. Under these circumstances, the Court does not find that the conflict-of-interest factor should receive significant weight.

Turning to the five *Shelton* factors recognized by the Eighth Circuit, the Court must now consider whether Liberty Life's interpretation of the Policy was consistent with the goals of the Policy; whether the interpretation renders any language in the Policy meaningless or internally inconsistent; whether Liberty Life's interpretation of the Policy's terms conflicts with the substantive or procedural requirements of the ERISA statute; whether Liberty Life, as the administrator of the Policy, interpreted the relevant terms consistently; and whether Liberty Life's interpretation is contrary to the clear language of the Policy. 285 F.3d at 643.

The Court begins its analysis by examining the Policy language. The Policy promises to pay benefits to employees who become "Disabled due to Injury or Sickness . . . ." (Doc. 12-1, p. 26). There are two different standards that the Policy utilizes to determine whether an employee qualifies as "disabled." The first standard, which is applicable in the instant case, is used "during the Elimination Period and the next 12 months of Disability." *Id.* at 13. This standard considers whether an employee, "as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation." *Id.* The second standard comes into play after the Elimination Period and ensuing 12 months of disability coverage have expired. Under the second standard, an

employee will continue to be considered "disabled" under the Policy if he "is unable to perform, with reasonable continuity, the Material and Substantial Duties of *Any Occupation*." *Id.* (emphasis added).

For purposes of interpreting the first standard, the "Elimination Period" is a period of consecutive days in which no benefit is payable, beginning with the first day of disability. *See id.* at 14. The Policy defines the "Material and Substantial Duties" of an employee's occupation as the "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." *Id.* In Mr. Zaeske's case, he was approved for benefits on June 4, 2014; his first day of disability was determined to be April 7, 2014; and he became eligible to receive benefits as of July 6, 2014. His Elimination Period, therefore, did not end until July 6, 2014. Since Mr. Zaeske's request for benefits was initially granted, and then cut off within the first 12 months of disability following the Elimination Period, the only question the Court must answer is whether Liberty Life abused its discretion in determining that his medical condition improved, such that he became able to perform the material and substantial duties of his former job, at the time disability benefits were terminated on December 12, 2014.

In reviewing the Administrative Record in this case, it is clear that Liberty Life's interpretation of the Policy, which it relied on in terminating Mr. Zaeske's benefits, was inconsistent with the Policy's goal of providing long-term disability benefits to qualified Plan members, in violation of the first *Shelton* factor. After Liberty Life completed its initial evaluation of Mr. Zaeske's medical condition, it decided that he met the definition of "disabled," and awarded him benefits. However, each subsequent medical evaluation

17

conducted by Liberty Life's reviewing physicians either ignored objective medical data in the file, failed to appreciate that his condition had not improved over time, or declined to consider whether he could still perform the material and substantial duties of a Risk Manager, given his documented limitations. To illustrate this point, the Court will now review the material inconsistencies and errors present in Liberty Life's reviewing-physician reports. This review clearly illustrates why Liberty Life's decision to terminate benefits was not supported by substantial evidence.

The Court begins with Liberty Life's first independent reviewing physician, Dr. Shannon, who evaluated Mr. Zaeske's medical file in late May of 2014 and determined that he was eligible to receive long-term disability benefits. Her opinion was reasonable and well supported by substantial evidence. Unlike the medical assessments that were performed later by other reviewing doctors, Dr. Shannon's assessment stands alone as the only one that properly considered the nature of Mr. Zaeske's job at Walmart, and the fact that it required light, rather than sedentary, activity. Indeed, the record reflects that at the time Mr. Zaeske first applied for benefits, his employer had begun to recognize that he could no longer perform his current duties and had encouraged him to find another job within the company. *See* Doc. 12-3, p. 13.

As per the Policy, Dr. Shannon undertook an analysis of whether Mr. Zaeske was medically disabled by considering the "own occupation" standard. In doing so, she reviewed the documentation submitted by his treating doctors and concurred in their collective diagnosis that he suffered from "[c]hronic low back pain with recently increased back and leg pain." *Id.* at 282. She also noted the objective evidence of his MRI, which "showed chronic appearing disc protrusion with severe stenosis at L4-5 . . . ." *Id.* His

constellation of symptoms caused her to conclude that Mr. Zaeske was limited in his ability to sit, stand, walk, bend, stoop, squat, climb ladders, or lift objects weighing more than ten pounds. *Id.* at 283. Therefore, due to his limited mobility, he could not perform the light-duty tasks that his job required—such as touring Walmart facilities and observing associate, customer, and supplier behavior, making presentations, driving to various facilities, and engaging in both domestic and international travel in furtherance of his duties. Importantly, Dr. Shannon also recognized that it would be impossible for her to estimate the date Mr. Zaeske might return to work, as this depended on his response to treatment.

Liberty Life reviewed its decision to award benefits, as it had the right to do under the Policy, on October 12, 2014. A request for updated medical information was put to Mr. Zaeske's doctors at that time, and Liberty Life determined that the documentation it received was not thorough enough to substantiate the continuing nature of the disability— despite the fact that the underlying diagnosis had not changed, no surgeries had been performed in the meantime, and his doctors confirmed that he continued to receive spinal injections and a daily cocktail of powerful anti-inflammatory and pain medications—including Gabapentin, Robaxin, oxycodone, and Dilaudid. Still, Liberty Life terminated his benefits as of December 12, 2014, but allowed him to submit additional medical information so his claim could be reevaluated.

The second independent medical review of Mr. Zaeske's file was performed at Liberty Life's request on or around December 23, 2014, by Dr. Glassman. This review was flawed and unreliable, and thus should not have formed the basis for Liberty Life's decision to uphold its denial of benefits—a decision that the Court finds was arbitrary and capricious

and rendered the language in the Policy meaningless and inconsistent, in violation of the second *Shelton* factor. Dr. Glassman ignored verified proof in the medical file that Mr. Zaeske suffered from disc protrusion, herniation, and lumbar stenosis. The Administrative Record is replete with evidence of this disc injury, and Dr. Shannon noted its existence in her report only seven months earlier. Evidently ignoring Mr. Zaeske's treating physicians' medical records and Dr. Shannon's opinion, Dr. Glassman opined that the "only diagnosis that could be causing impairment" was "lumbar degenerative disc disease and back pain." *Id.* at 143.

This incorrect diagnosis led Dr. Glassman to assume that Mr. Zaeske was less impaired than he actually was—and contributed to a domino-effect of faulty assumptions and unsupported recommendations. Because Dr. Glassman had determined that Mr. Zaeske's mobility was greater than it actually was, he opined that Mr. Zaeske could perform more tasks on the job than he was actually capable of performing. It therefore comes as no surprise that Dr. Glassman found Mr. Zaeske capable of returning to his former job and performing "full time activities through a work day." *Id.* Without any reason given for Mr. Zaeske's sudden, and rather magical, physical improvement, Dr. Glassman advised Liberty Life that Mr. Zaeske could now perform such herculean tasks as "lifting 50 pounds occasionally," "frequent standing and walking," sitting for *any* length of time with "no restrictions," and "frequent reaching and driving." *Id.*

Dr. Glassman's report also focused excessively on Mr. Zaeske's range of motion, emphasizing that his medical records appeared to reflect "no deficits for range of motion or strength for the upper or lower extremities or spine." (Doc. 12-3, p. 144). Though range of motion certainly determines how far a person can reach or bend, it does not fully

address a patient's pain level while exercising that range of motion. Reports submitted by all three of Mr. Zaeske's treating physicians consistently documented his increasingly uncontrolled levels of pain over time. This type of pain was treated with multiple epidural steroid injections, radiofrequency ablation procedures, medial branch nerve blocks, a radiofrequency neurotomy, and various, powerful narcotic medications—all to no avail. Nowhere in Dr. Glassman's report did he acknowledge Mr. Zaeske's pain as being uncontrolled. He did not address how uncontrolled pain would affect Mr. Zaeske's ability to walk, sit, lift heavy things, or travel. Further, nowhere in his report did Dr. Glassman mention the effects of the narcotics that Mr. Zaeske was taking or the fact that Dr. Potts noted multiple times in documents submitted to Liberty Life that the medications caused Mr. Zaeske to experience somnolence, decreased concentration, confusion, an inability to drive, and an inability to make decisions. *See, e.g., id.* at 42.

The law provides that a plan administrator, such as Liberty Life, may credit a consulting physician's findings even when they conflict with treating physicians' opinions, provided that the consulting physician's findings are considered reliable. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003); *see also House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001) (if an independent medical examination had been performed, the administrator would have been "entitled to discount [the treating physician's] opinion entirely in favor of a contrary opinion produced by the independent examiner"). In Mr. Zaeske's case, however, there is no question that Dr. Glassman's findings and recommendations were unreliable, which means that Liberty Life's complete reliance on those findings was unreasonable and constituted an abuse of its discretion as

Plan Administrator. The Court need not defer to Liberty Life's December 2014 finding that Mr. Zaeske was not disabled according to the Policy.

Moving on to Mr. Zaeske's February 2015 appeal, the Court finds that Liberty Life's decision to again defer to and rely on Dr. Glassman's original report was an abuse of discretion. The record reflects that for the appeal, Dr. Potts provided an updated letter on Mr. Zaeske's condition, as well as a "Restrictions Form," which noted that someone in Mr. Zaeske's current physical condition would ordinarily be capable of performing sedentary work (as opposed to the "light" level of work required for being a Risk Manager), but that sedentary work was impossible in Mr. Zaeske's particular case because of the effects of his pain medications on his ability to think and concentrate. *See id.* at 113. It is evident that Liberty Life did not meaningfully consider either of these updated records or Mr. Zaeske's robust medical file in upholding its decision to deny benefits on March 10, 2015. The denial letter simply cited back to Dr. Glassman's December 23, 2014 report and relied on it exclusively in denying Mr. Zaeske's appeal. *See* Doc. 12-2, pp. 5-6. Accordingly, the Court declines to defer to Liberty Life's March 2015 finding that Mr. Zaeske was not disabled according to the Policy.

Finally, the Court arrives at Mr. Zaeske's second appeal, which was reviewed by Dr. Reecer. Unlike Dr. Glassman, Dr. Reecer acknowledged that Mr. Zaeske did, in fact, suffer from something more than mere back pain. Dr. Reecer affirmed that the medical file supported diagnoses of lumbar degenerative disc disease, lumbar herniated disc, chronic pain, and long-term narcotic usage. (Doc. 12-3, p. 26). Nevertheless, Dr. Reecer's medical opinion was unreasonable and unsupported by the medical evidence, as he omitted from his report any consideration of whether Mr. Zaeske's chronic pain would impact his ability

to function in the workplace.  Dr. Reecer claimed to have reviewed Mr. Zaeske's doctors' reports and the long list of pain medications Mr. Zaeske had been prescribed, but Dr. Reecer nonetheless failed to consider how those medications affected Mr. Zaeske's ability to perform: (1) any tasks that would involve alertness, coordination, and mobility, and (2) any tasks specifically listed in his job description as Risk Manager that could not reasonably be eliminated or modified, as per the Policy's definition of "Material and Substantial Duties."  Instead, Dr. Reecer inexplicably opined that Mr. Zaeske suffered from "[n]o side effects from the current medication regimen," and "[t]herefore there are no restrictions based on the current medication regimen."  *Id.* at 27.

Dr. Reecer's ultimate recommendation that Mr. Zaeske was capable of sitting for one-hour intervals, walking for one-hour intervals, standing for 30-minute intervals, and engaging in occasional climbing, crawling, squatting, kneeling, stooping, and crouching, *see id.* at 26, was also unsupported by the record, and stood in direct contradiction to Dr. Shannon's earlier report and recommendation, which assumed *the identical medical diagnoses* of chronic low back pain, disc herniation, and severe lumbar stenosis.  If anything, the numerous medical records submitted after Dr. Shannon filed her report indicate that Mr. Zaeske's condition either remained the same or worsened over time, and that his pain remained uncontrolled.  Nowhere in the record is there any evidence that Mr. Zaeske's condition improved after the original decision to grant benefits.  Accordingly, Dr. Reecer's recommendation that Mr. Zaeske could perform far more tasks than Dr. Shannon determined he could perform—given the same medical diagnosis—rendered the Policy's definition of "disability" as meaningless or internally inconsistent, in violation of the second *Shelton* factor.

23

Liberty Life's conduct also violated the third *Shelton* factor, which asks whether the administrator's interpretation of the insurance policy conflicts with the substantive or procedural requirements of the ERISA statute. "ERISA requires all plan fiduciaries—a term that includes plan administrators—to discharge their duties in accordance with the plan documents." *Torres*, 405 F.3d at 681 (citing 29 U.S.C. § 1104(a)(1)(D)). Here, Liberty Life failed to discharge its duty to assess Mr. Zaeske's eligibility for long-term disability benefits when it ignored evidence from his treating physicians that was directly related to the Policy's definition of "disabled." Moreover, Liberty Life's reliance on conflicting recommendations—for the same medical diagnosis—made by three independent reviewing physicians shows that the Policy's terms were interpreted inconsistently, in violation of the fourth *Shelton* factor.

Lastly, the Court finds that Liberty Life's deference to Dr. Reecer's opinion and its finding that Mr. Zaeske did not meet the definition of "disabled" under the Policy was contrary to the clear language of the Policy, in violation of the fifth *Shelton* factor. The Policy specifically defines a claimant as "disabled" in terms of his ability to perform a particular job, and Dr. Reecer failed to consider whether Mr. Zaeske could perform the material and substantial duties required of a Risk Manager, in light of the many restrictions and limitations that even Dr. Reecer deemed necessary. For all of these reasons, the Court need not defer to Liberty Life's June 2015 finding that Mr. Zaeske was not disabled according to the Policy.

As Mr. Zaeske has prevailed in all respects in this matter, Liberty Life's decision to terminate his long-term disability benefits will be reversed. Mr. Zaeske will be entitled to receive benefits from the time they were initially terminated in December of 2014, through

the remainder of the 12-month period of time that followed. The Court will also order Liberty Life to pay Mr. Zaeske a check representing the lump-sum total amount of benefits owed within 30 days of the entry of this Order.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Liberty Life Assurance Company of Boston's decision to terminate Plaintiff Damon Zaeske's long-term disability benefits is **REVERSED**, and the claim is **REMANDED** to Defendant to calculate the correct amount of past-due benefits owed.

**IT IS FURTHER ORDERED** that Defendant pay all past-due benefits owed to Plaintiff in the form of a lump-sum check within 30 days of the date of this Order.

**IT IS FURTHER ORDERED** that Mr. Zaeske's attorney submit his petition for reimbursement of his reasonable fees and costs expended in prosecuting this appeal, in accordance with ERISA, within 30 days of the date of this Order.

**IT IS SO ORDERED** on this 5ᵗʰ day of June, 2017.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE